# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 23, 2012 Session

## STATE OF TENNESSEE v. HORACE HOLLIS

### Appeal from the Circuit Court for Dickson County
### No. CR5665    Robert Burch, Judge

### No. M2011-01463-CCA-R3-CD - Filed May 22, 2012

A Dickson County Circuit Court jury convicted the defendant, Horace Hollis, of two counts of rape of a child and two counts of aggravated sexual battery. The trial court merged the convictions of aggravated sexual battery into the convictions of rape of a child and imposed a sentence of 40 years' incarceration. In this appeal, the defendant challenges the sufficiency of the convicting evidence. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

Peggy R. Smith, White Bluff, Tennessee, for the appellant, Horace Hollis.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Ray Crouch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Originally charged with 40 counts of aggravated sexual battery and 40 counts of rape of a child, the defendant was convicted of two counts of rape of a child and two counts of aggravated sexual battery for acts committed against VMW and HLS, the granddaughters of his ex-wife.[1] Prior to trial, the State agreed to sever the 80-count indictment into groups of four based upon offense date. A Dickson County Circuit Court jury acquitted the defendant of counts 77 through 80, the first four counts to go to trial.

---

[1]It is the policy of this court to refer to minor victims of sexual crime by their initials.

Counts 73 through 76 proceeded to trial in February 2011 and resulted in the convictions at issue in this appeal. Following the trial in this case, the remaining counts of the indictment were dismissed by the State.

Former Department of Children's Services ("DCS") case worker Veronica Gomez testified that she received a referral on August 1, 2001, and she arranged for the victims to be interviewed and examined at Our Kids Center. Ms. Gomez interviewed the girls herself on August 7, 2001. She said that during that interview, HLS "disclosed actual sexual penetration . . . by the penis . . . . [i]nto the vaginal area," while VMW "only disclosed digital penetration." HLS told Ms. Gomez that the defendant put his penis "into her monkey all the way and it hurt." The girls indicated to Ms. Gomez that they were afraid of what their mother might say about the abuse.

Sue Ross, a pediatric nurse practitioner employed at Our Kids Center testified that she performed a physical examination of the victims on August 10, 2001. During the examination, HLS, who was six years old, disclosed that she had been sexually abused by the defendant, whom she called "Papa Buddy." HLS told Ms. Ross that the defendant had penetrated her vagina with his fingers and penis and that he had forced her to touch his penis. Ms. Ross characterized HLS's genital examination as normal. VMW, who was five years old at the time of the examination, reported to Ms. Ross that "Papa Buddy" "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." According to Ms. Ross, VMW said that the defendant penetrated her vagina with his penis. A genital examination of VMW was normal.

Dickson County Sheriff's Department Detective B.J. Gafford was assigned to the case on August 2, 2001, and, after DCS interviews confirmed the girls' report of abuse, he obtained a warrant for the defendant's arrest on August 10, 2001. According to Detective Gafford, the defendant was not home when officers arrived at the defendant's residence, but the owner of the residence, the girls' grandmother, Helen Oney, gave them consent to search the residence. The defendant's belongings, including his necessary medications and clothing, were still in the residence. In the defendant's room, officers found children's toys and videos mingled with pornographic magazines.

During cross-examination, the detective acknowledged that he did not actually interview either of the girls because "they did not want [him] in there while they were being interviewed by Ms. Gomez." Detective Gafford said that he did interview the victims' mother, who told him that the girls went to stay with Ms. Oney once a month and that the victims occasionally spent the night in the defendant's room when they visited Ms. Oney. He testified that he also interviewed Ms. Oney, who told him that she saw the girls "[a]pproximately every other week." Ms. Oney also told the detective that the defendant

-2-

"would have little parties for [the victims] down there [in his room] and give them something to drink and candy and they would stay down there with him sometimes." Detective Gafford explained that the defendant rented the basement apartment of Ms. Oney's residence.

Tennessee Bureau of Investigation ("TBI") Agent Jeri Powell, who described himself as the special agent "in charge of the State Fugitive Center and Criminal Intelligent [sic] Unit," testified that Dickson County authorities asked the TBI to assist in locating the defendant on August 10. Agent Powell said that the TBI worked the case "over several months from the month of August until the month of April" and eventually located the defendant's rental car in Texas. The defendant was arrested in April 2002 "[w]orking for a carnival in Temple, Texas" under his own name.

The victim's grandmother and the defendant's ex-wife, Helen Oney, testified that after their divorce, the defendant began renting a room in her basement in October 2000. Ms. Oney and her third husband lived upstairs. Ms. Oney said that the victims spent every other weekend with her at her residence and that the defendant, who was an over-the-road truck driver, arranged his schedule so that he could "be there when they [were] there every other weekend." Ms. Oney recalled that the girls often went into the defendant's living quarters and that she "thought they [were] down there watching movies 'cause he was always renting movies." She said that the victims had toys and books in the defendant's living area and that the defendant brought the children presents. Ms. Oney recalled specifically that the victims were staying at her house on June 16 and 17, 2001, because that weekend was near HLS's birthday and the family gave her a party.

Ms. Oney testified that on August 1, 2001, the girls' mother telephoned her and told her "that she's at the hospital with [HLS] and [VMW] and they had been touch[ed by] . . . 'their grandpa.'" The girls called the defendant "Papa Buddy." Ms. Oney said that the defendant, who was sitting next to her and overheard the conversation, "shook his head no" and "got up and left the room real quick." She recalled that by the time she got off the telephone, the defendant had left the house and was headed "[u]p the driveway in his car." She said that she did not see him again but talked to him via telephone. During that conversation, Ms. Oney told the defendant that he was in trouble and should turn himself in to authorities, and he responded, "[N]o I'm not. I didn't do nothing."

During cross-examination, Ms. Oney said that she occasionally allowed the victims to spend the night with the defendant in his room and that the girls never acted strangely after doing so. Ms. Oney acknowledged that neither victim ever refused to visit her on the weekends or complained of genital pain or showed any other signs, such as bloody underwear, that they might be being sexually abused.

The victims' mother, Joyce West, testified that on August 1, 2001, HLS told her that the defendant had "touched her." Ms. West said that she "had a nervous breakdown" as a result of the disclosure, and then she telephoned police and her mother.

During cross examination, Ms. West maintained that the girls were not supposed to be around the defendant because she "knew something was going on but . . . couldn't put [her] finger on it." She said that she allowed the girls to be around the defendant so long as she was with them.

HLS, who was 15 years old at the time of trial, testified that the defendant "would put his hand down [her] pants and put his fingers . . . inside" her vagina. She said that she thought that the defendant did this "several" times in his basement room, but she could only remember "like maybe two times." She said that it hurt when he did it. HLS testified that the defendant told her that if she told anyone about the abuse, he would "kill everybody."

VMW, who was four years old at the time of the abuse, testified that she did not "really remember anything" but that the defendant's name "really upsets [her]." She had no memory at all of any abuse. She said that she had been going to counseling and "trying to bring up the memories" but that she did not "have any memories at all."

On the basis of this proof, the jury convicted the defendant as charged of two counts of aggravated sexual battery and two counts of rape of a child. The trial court attempted to merge the convictions of aggravated sexual battery into the convictions of rape of a child, but, for reasons discussed more fully below, the merger was ineffectual. Following a sentencing hearing, the trial court imposed a total effective sentence of 40 years' incarceration.

In this appeal, the defendant challenges the sufficiency of the convicting evidence, arguing that "[t]he State failed to prove beyond a reasonable doubt that the circumstances were so closely interwoven and connected that the finger of guilt was pointed unerringly at the defendant." The State contends that the evidence was sufficient to support the defendant's convictions.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State*

-4-

*v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Although admittedly not overwhelming, the proof adduced at trial sufficiently supports each of the defendant's convictions. Ms. Ross testified that HLS told her that the defendant penetrated her vagina with his fingers and that he had forced her to touch his penis. VMW reported to Ms. Ross that the defendant "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." Both girls made similar disclosures to Ms. Gomez. Although this evidence may have been excludable as hearsay, the defendant made no objection to its admission. Thus, the jury was free to consider it as substantive evidence of the defendant's guilt. *See State v. Smith*, 24 S.W.3d 274 (Tenn. 2000). With regard to the convictions involving HLS, she confirmed at trial that the defendant had placed his hand inside her pants and penetrated her vagina with his finger. In consequence, we affirm the convictions.

That being said, we perceive a problem with the merger of offenses in this case. Following the jury verdict, the trial court entered judgment forms memorializing each jury verdict.[2] Because these forms did not contain any sentencing information, they were obviously incomplete and ineffectual as judgments. T.C.A. § 40-35-209(e), (g); Tenn. Sup. Ct. R. 17. After the sentencing hearing, the trial court entered new, "amended" judgment forms for the two convictions of rape of a child. These judgments forms imposed a sentence of 20 years' incarceration for each conviction along with a notation in the "special conditions" portion of the judgment form that counts 73 and 75, the convictions of aggravated sexual battery "are to stay the same," which the court apparently intended to act as merger of the offenses. Without addressing the propriety of merger in this case and merely attempting to facilitate the trial court's intent to merge offenses, we point out, as we have explained before, to effectively merge verdicts of guilty, a single judgment of conviction noting the jury's verdict of the merged offense should be entered. Because the trial court's action in this case did not effectively merge the convictions, the case must be remanded. On remand, the trial court shall vacate all previously-filed judgment forms and replace them with one judgment form for each conviction of rape of a child noting that the companion conviction of aggravated sexual battery has been merged into that offense.

_____
JAMES CURWOOD WITT, JR., JUDGE

_____

[2]We would discourage trial courts from engaging in such a practice because filing incomplete judgment forms increases the likelihood of error, as is demonstrated by this case.